# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

July 1, 1998

Cecil W. Crowson
Appellate Court Clerk

CONSUMER ADVOCATE DIVISION,   )
                                          )
        Petitioner/Appellant,        )
                                          )    Appeal No.
VS.                                )    01-A-01-9708-BC-00391
                                          )
TENNESSEE REGULATORY       )    Tennessee Regulatory Commission
AUTHORITY; NASHVILLE GAS    )    No. 96-00977
COMPANY,                    )
                                          )
        Respondents/Appellees.    )

## APPEALED FROM THE TENNESSEE REGULATORY COMMISSION
## AT NASHVILLE

JOHN KNOX WALKUP
Attorney General & Reporter

L. VINCENT WILLIAMS
Assistant Attorney General
425 Fifth Avenue North
Nashville, Tennessee 37243
       Attorney for Petitioner/Appellant

H. EDWARD PHILLIPS, III
Tennessee Regulatory Authority
460 James Robertson Parkway
Nashville, Tennessee 37243-0505
       Attorney for Respondent/Appellee Tennessee Regulatory Authority

T. G. PAPPAS
JOSEPH F. WELBORN III
2700 First American Center
Nashville, Tennessee 37238

JERRY W. AMOS
P. O. Box 787
Greensboro, North Carolina 27402
       Attorneys for Respondent/Appellee Nashville Gas Company

HENRY WALKER
414 Union Street, Suite 1600
Nashville, Tennessee 37219
       Attorney for Intervening Appellant Associated Valley Industries

## AFFIRMED AND REMANDED

BEN H. CANTRELL, JUDGE

# O P I N I O N

This petition under Rule 12, Tenn. R. App. Proc., to review a rate making order of the Tennessee Regulatory Authority presents a host of procedural and substantive issues. We affirm the agency order.

## I.

On May 31, 1996 Nashville Gas Company (NGC) filed a petition before the Tennessee Public Service Commission requesting a general increase in its rates for natural gas service. The proposed rates would produce an increase of $9,257,633 in the company's revenue. The Consumer Advocate Division (CAD) of the State Attorney General's office filed a notice of appearance on June 6, 1996 and Associated Valley Industries (AVI), a coalition of industrial users of natural gas, entered the fray on August 20, 1996.

The Public Service Commission was replaced on July 1, 1996 by the Tennessee Regulatory Authority (TRA), a new agency created by the legislature. By an administrative order, TRA laid down the procedure by which it would accept jurisdiction of matters previously filed before the Public Service Commission, and the parties successfully navigated the uncharted waters of the TRA to get the case ready for a final hearing on November 13, 1996.

At a scheduled conference on December 17, 1996, the TRA orally approved a general rate increase for NGC, effective January 1, 1997, that would produce approximately $4,400,000 in new revenue. When a final order had not been filed by December 31, 1996, NGC began charging the rates orally approved at the conference on December 17. On February 19, 1997 TRA filed its written order adopting the oral findings of December 17, 1996. The order allowed the increased rates "for service rendered on and after January 1, 1997."

## II. The Procedural Issues

### a.

### Was the TRA required to appoint an administrative law judge or hearing officer to conduct the hearing?

The Tennessee Administrative Procedures Act provides that a contested case hearing shall be conducted (1) in the presence of the agency members and an administrative judge or hearing officer or (2) by an administrative judge or hearing officer alone. Tenn. Code Ann. § 4-5-301(a). The CAD asserts that the TRA's order in this case is void because the agency did not follow the mandate of this statute.

The TRA, however, is also governed by an elaborate set of procedural statutes. *See* Tenn. Code Ann. § 65-2-101, et seq. Tenn. Code Ann. § 65-2-111 provides that the TRA <u>may</u> direct that contested case proceedings be heard by a hearing examiner, and we held in *Jackson Mobilphone Co. v. Tennessee Public Service Comm.*, 876 S.W.2d 106 (Tenn. App. 1994), that the TRA's predecessor, the Public Service Commission, could conduct a contested case hearing itself <u>or</u> appoint a hearing officer. We think that decision is still good law and that it applies to the TRA.

### b.

### Did the TRA staff conduct its own investigation and improperly convey ex parte information to the TRA?

The CAD argues that the TRA violated two sections of the UAPA in the proceeding below: (1) the section prohibiting a person who has served as an investigator, prosecutor, or advocate in a contested case from serving as an administrative judge or hearing officer in the same proceeding, Tenn. Code Ann. § 4-5-303; and (2) the section prohibiting ex parte communications during a contested case proceeding, Tenn. Code Ann. § 4-5-304.

As to the first contention, there is nothing in the record that supports it. The Regulatory Authority members sat as a unit to hear the proof in the hearing below. We have held that they were entitled to do so. There is no proof that any of them had served as an investigator, prosecutor, or advocate in the same proceeding.

As to the second contention, it is based on the CAD's suspicion that members of the TRA staff had taken part in an investigation of NGC, had prepared a report for the Authority, and had, in fact, continued to communicate with NGC and relay that information to the Authority members.

At the beginning of the hearing the Consumer Advocate moved to discover what he described as a report from the staff that augmented or boosted the position of one party or the other. He admitted that he did not know that such a report existed but that he believed it did, because of the past practice before the Public Service Commission.

The Authority chairman moved to deny the motion with the following explanation:

> I believe that as a director I have a right to have privileged communication with a member of my staff for the purpose of understanding issues and analyzing the evidence in the many complicated proceedings that this Agency has to hear. I reject your allegation that I have abdicated my responsibility as a decision maker. I rely on my staff expertise as the law permits me to do so. Therefore, I move that your motion be denied.

The Agency members unanimously denied the CAD's motion.

On this part of the controversy we are persuaded that the TRA was correct. The TRA deals with highly complicated data involving principles of finance, accounting, and corporate efficiency; it also deals with the convoluted principles of legislative utility regulation. To expect the Authority members to fulfill their duties without the help of a competent and efficient staff defies all logic. And, we are

convinced, the staff may make recommendations or suggestions as to the merits of the questions before the TRA. *See* Tenn. Code Ann. § 4-5-304(b). Otherwise, all support staff -- law clerks, court clerks, and other specialists -- would be of little service to the person(s) that hire them. We are satisfied that any report made by the agency staff based on the record before the TRA was not subject to the CAD's motion to discover it.

The other part of the CAD's contention is more troubling. It contains an assertion that members of the TRA staff were passing along to the TRA evidence received from NGC. We would all agree that such ex parte communications are prohibited. *See* Tenn. Code Ann. § 4-5-304(a) and (c).

In support of his contention Consumer Advocate called the manager of the utility rate division who testified that he did an investigation of NGC under an audit. At that point the parties engaged in a general discussion about the Authority's prior ruling that the staff members' advice could not be discovered. A question about whether his advice was based on anything other than the facts in the record was excluded after an off-the-record discussion, and the witness was asked only one other question. He answered "yes" when asked if he had talked with the company or company officials since the time of the audit. There were no questions bearing on the nature of the conversations, or whether the witness received or disseminated any information pertinent to the NGC proceeding.

We cannot find on the basis of the evidence in this record that the Agency received any ex parte communications that were prejudicial to the CAD's position. We would add only one further point: that administrative agencies should ensure compliance with the Administrative Procedures Act.

**c.**

**Did NGC unlawfully put its**

- 5 -

**new rates into effect on January 1, 1997?**

The CAD argues that since no written order had been entered allowing the rate increase, NGC had no authority to start charging the increased rates, and the TRA's February order amounted to retroactive ratemaking.

The TRA has the power to fix just and reasonable rates "which shall be imposed, observed, and followed thereafter" by any public utility. Tenn. Code Ann. § 65-5-201. But the statutory scheme -- which is the same as it was during the existence of the Public Service Commission -- recognizes that a public utility may set its own rates, subject to the power given to the TRA to determine if they are just and reasonable. Tenn. Code Ann. § 65-5-203(a). *See Consumer Advocate Division v. Bissell*, No. 01-A-01-9601-BC-00049 (Tenn. App., Nashville, Aug. 26, 1996). The increased rates may be suspended for an outside limit of nine months while the TRA conducts its investigation, *id.*, but after six months the utility may, upon notice to TRA, place the increased rates into effect. Tenn. Code Ann. § 65-5-203(b)(1). The authority <u>may</u> require a bond in the amount of the proposed annual increase. *Id.*

In this case, NGC filed its petition on May 31, 1996. Because the Public Service Commission was replaced by the TRA on July 1, 1996, NGC refiled the petition on July 29, 1996. The CAD argues that the petition, therefore, had not been pending for the six months period that would allow NGC to put the rates into effect.

Under the circumstances of this case, however, we think that argument exalts form over substance. The TRA had heard the proof, and in an open meeting had announced its decision to allow part of the rate increase to go into effect on January 1, 1997. While a written order had not been entered, NGC notified the TRA that it would put the approved rates into effect on the date specified in the TRA's oral decision.

In our view, the increased rates had been pending since May. The hiatus between May and July was caused by a massive overhaul of the state regulatory machinery, and that fact cannot be attributed to NGC. So, under the statutory scheme, NGC had the power to put the approved rates into effect on January 1, 1997.

In addition, Tenn. Code Ann. § 65-2-112 says "Every final decision or order rendered by the authority in a contested case shall be in writing, or stated in the record . . . ." NGC could have used the TRA's oral decision as the basis for its action of putting the rates into effect. The decision had been "stated in the record" on December 17, 1996. We add this caveat, however. The statute goes on to say that either a written or oral decision "shall contain a statement of the findings of fact and conclusions of law upon which the decision of the authority is based." We do not express an opinion on whether the December 17 oral decision complies with that mandate. But we do agree that findings of fact and conclusions of law are a necessary requirement for a meaningful review of an administrative agency's decision. *See Levy v. State Bd. of Examiners for Speech Pathology & Audiology*, 553 S.W.2d 909 (Tenn. 1977).

### III. The Substantive Issues

### a. Hearsay

The CAD argues that some of the evidence offered by NGC's expert on the projected increase in company expenses was based on rank hearsay. We notice, however, that Tenn. Code Ann. § 65-2-109 allows TRA to admit and give probative effect to any evidence that would be accepted by reasonably prudent persons in the conduct of their affairs. The same statute relieves the TRA from the rules of evidence that would apply in a court proceeding.

The CAD does not address the question of whether the evidence it calls hearsay is, nevertheless, of the kind that would be relied on by reasonably prudent persons in the conduct of their affairs. NGC argues that the evidence was not hearsay because it was based on the company records that are kept in the ordinary course of business. *See* Tenn. R. Evid. 801, 803(6). We need not decide whether the proffered evidence was hearsay because we are satisfied that the evidence was reliable and could be considered by the TRA. The TRA heard the objections to the evidence and the CAD's argument that its evidence on the same subject should have been received. The TRA chose NGC's evidence as more reliable. We find no fault with the TRA's decision on this issue.

### b. Advertising

This is an issue on which the briefs of the principal parties seem to be speaking different languages. The following explanation is the best we can glean from the record. In 1984 the Public Service Commission adopted a rule that disallowed as a recoverable expense by a utility any "promotional or political advertising." The prohibition covered advertising for the purpose of encouraging any person to select or use gas service or additional gas service. It did not cover (among other things) advertising informing customers how to conserve energy or to reduce peak demand for gas, or advertising promoting the use of energy efficient appliances. *See* former Rule 1220-4-5-.45, Tenn. Regis.

In a 1985 proceeding involving a rate increase application by NGC, the Commission deviated from the rule and allowed advertising expenses up to .5% of revenues. In March of 1996 the Commission repealed 1220-4-5-.45 and proposed a new rule that would allow a utility to recover "all prudently incurred expenditures for advertising." Apparently the rule had not made it completely through the adoption procedure when the TRA heard this case below.

Nevertheless, based on proof of $1,486,000 in external advertising expenses, $800,000 in marketing personnel payroll and $300,000 in miscellaneous sales expenses, the TRA allowed the recovery of all but approximately half of the external advertising expenses. The CAD urged disallowance of all the related expenses except approximately $647,000 and NGC claims that the TRA erred in reducing the external operating expenses because there was no proof that they were imprudently incurred.

We think the TRA was justified in its conclusion on this issue. Based on the testimony in the record that the advertising expenses were incurred to meet competition, to add new customers on existing mains, and to get existing customers to use more gas, the TRA concluded that the rate payers benefited from at least part of the external advertising.

### c. The Long Term Incentive Plan

The TRA allowed NGC to recover approximately one-half of the cost of its Long Term Incentive Plan. The CAD opposes the allowance of any of this expense on the basis that the plan encourages executives to seek growth through rate increases instead of through performance gains. According to the CAD, the plan does not promote improved service.

NGC offered evidence, however, that the plan had increased employee efficiency and had reduced the number of company employees per customer in Tennessee. The savings amounted to $7 million annually in wages and salaries. The same witness rebutted the CAD witness who testified that the plan encourages employees to seek rate increases rather than improved efficiency.

None of the parties to the appeal cited any authority governing the allowance of incentive payments in utility rate cases. The proof included some references to cases in other jurisdictions where that state's utility commission had allowed either 100% of the incentive payments or some fraction thereof. The consensus seems to be to look at each plan on a case by case basis and view each plan in the context of the utility's total compensation package.

We do not think the TRA erred in the treatment of the long term incentive plan in this case.

### d. Rate of Return

NGC requested a rate of return on equity in the range of 13% to 13.25%. The CAD requested an 11% rate of return and offered expert testimony showing that monthly compounding of the company's income would raise the rate of return to 11.60%. The TRA set a rate of return of 11.5%.

We fail to see how either side could make much of a case on appeal. The TRA's findings and conclusions are supported by evidence in the record that is both substantial and material. *See* Tenn. Code Ann. § 4-5-322(h). A proper rate of return is not a point on a scale, *Tennessee Cable Television Ass'n v. PSC*, 844 S.W.2d 151 (Tenn. App. 1992), it covers a fairly broad range, as indicated by the testimony of the competing experts in this case. We affirm the TRA's decision on this point.

We take no position on the issue of the compounding effect of the company's receipts. It is a concept that is new to us in utility regulation, and its merits need to be explored more thoroughly than they have been in this record.

### IV. The Rate Design

- 10 -

The intervenor, AVI, challenges the part of the TRA's order that raised the "tailblock" rate for gas supplied to NGC's largest interruptible customers. The tailblock rate is the lowest rate charged per unit and it applies to usage of over 9,000 decatherms per month.[1] NGC's petition did not seek any increase in the rates falling in this category. The CAD's proof proposed that any changes be spread to all customer classes, but the intervenor sought an overall rate decrease. AVI's witness testified that industrial rates were set well above costs and should not be increased The TRA's order increased the tailblock rate from $0.21 per decatherm to $0.228 per decatherm. The TRA said in its order:

> After careful consideration of the testimony and exhibits of the parties, the Authority finds that the rate increase approved herein should be spread equally to all customers. It is the intent of the Authority to spread this increase to all ratepayers, including interruptible Sales customers, Transportation customers, and Special Contract customers, in order to minimize the overall impact of this rate change. In addition, the Authority concludes that the residential customer charge should be increased from $6.00 per month to $7.00 per month.

We think the question of whether to spread the rate increase to all classes of users was within the discretion of the TRA. In *CF Industries v. Tenn. Pub. Serv. Comm.*, 599 S.W.2d 536 (1980), our Supreme Court said:

> Specifically, there is no requirement in any rate case that the Commission receive and consider cost of service data, or what such data, if in the record, are to be accorded exclusivity. It is self-evident that cost of service is of great significance in the establishment of rates but is of lesser value in arriving at rate design. A fair rate of return to the regulated utility is one thing; the establishment of rates among various customer classes is quite another.

599 S.W. at 542.

\* \* \*

> Thus, the Public Service Commission in rate making and design cases is not solely governed by the proof although, of course, there must be an adequate evidentiary predicate. The Commission, however, is not

---

[1]There are three other blocks in the interruptible industrial category of users. Block one applies to usage of 1-1,500 decatherms per month; block two covers the 1,501-4,000 category; and block three applies to the 4,001-9,000 category.

hamstrung by the naked record. It may consider all relevant circumstances shown by the record, all recognized technical and scientific facts pertinent to the issue under consideration and may superimpose upon the entire transaction its own expertise, technical competence and specialized knowledge. Thus focusing upon the issues, the Commission decides that which is just and reasonable. This is the litmus test -- nothing more, nothing less.

599 S.W. at 543.

We think it would be a rare case where the court would interfere with a rate increase spread evenly over all classes of users. If the rate design is inequitable it was not established in this proceeding. Therefore, a request that the rate increase be applied unevenly is, in fact, a request to change the rate design -- on which the intervenor would have the burden of proof. A change would have to be shown by a greater amount of proof than appears in this record.

The TRA's order is affirmed and the cause is remanded to the Tennessee Regulatory Authority for enforcement. Tax the costs on appeal to the Consumer Advocate Division.

_____
BEN H. CANTRELL, JUDGE

CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

_____
WILLIAM C. KOCH, JR., JUDGE

- 12 -